Michael P. Collins
Bond, Schoeneck & King, PLLC
330 Madison Avenue, 39th Floor
New York, NY 10017
Phone: (646) 253-2318
Facsimile: (646) 253-2301

Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------- X
WEIMIN HU,                           :   **AFFIDAVIT OF LIMAN HU IN**
                                         **OPPOSITION TO PETITION OF**
         Petitioner,                 :   **WEIMIN HU FOR PRE-COMPLAINT**
                                         **DISCOVERY**
   -against-                         :

KAIHUA CAI, LIMAN HU and CAI         :
RESEARCH, LLC,                           Civil Action No. 13-cv-7080 (ES) (JAD)

         Respondents.                    ECF Case
------------------------------------- X

COUNTY OF SUFFOLK   )
                    ) ss.:
STATE OF NEW YORK   )

  Liman (aka "Mimi") Hu, being duly sworn, deposes and says:

  1. I am a respondent to this Petition and make this Affidavit based on personal knowledge and in opposition to the Petition of Weimin Hu.

  2. I came to the United States 15 years ago from Hunan, China to study at Wesleyan University and the California Institute of Technology on full merit scholarships and obtained a B.A. in economics and physics. I have been a permanent resident of the United States since 2010, but have lived here since 1998.

65329.2 12/13/2013

3. I met my husband, Kaihua Cai, in 2001. We have been married for six years. Kaihua Cai came to the United States from Jiangsu, China in 2000 to study at the California Institute of Technology, from which he obtained a Ph.D. in mathematics.

4. The assertion in Weimin Hu's Petition that my husband is a potential flight risk is not only baseless, but insulting. We are both permanent residents of the United States, my two year old child is an American born United States citizen and we purchased a home in New York in August 2013. The suggestion my husband might flee to China as a result of Weimin's campaign of legal harassment is complete fiction.

5. I am providing this Affidavit in lieu of my husband because almost all of the communications with Weimin Hu relevant to his Petition were directly with me, via phone calls, Skype, emails, text messages, and not with my husband.

6. My husband Kaihua formed Cai Research LLC in December 2010 in New Jersey in anticipation of creating a business focused on researching and building automated trading models for the currency market. During 2011, my husband was consulting for a UK based hedge fund while we considered whether to pursue setting up an automated trading model by ourselves.

7. In the fall of 2011, my husband and I began actively exploring the possibility of raising investment funds for a quantitative trading model. I mentioned this idea to my friends and family in China including my cousin, Yuhang Yang, a close relative and well-respected business leader in China. My cousin suggested I talk to his friend, Petitioner Weimin Hu. In fact, I had previously been contacted by Weimin Hu through my cousin in September 2011 in connection with Mr. Hu's desire to assist his son in landing a job in the United States. His son (Miao Hu) had recently completed a master's degree in financial engineering from the University

of Chicago in June 2011. However, Miao was unable to find a suitable financial job in the United States, and he returned home to Beijing, China.

8. Based on my cousin's endorsement, I began communicating with Weimin Hu. When we initially started to think about funding the start-up trading model business, we were seeking investors. However, as my conversations with Weimin Hu progressed and he expressed interest in helping to fund our start-up enterprise, he insisted that the amount we were discussing ($300,000) was to be a gift.

9. At one point, I mentioned to Weimin that I would ask an attorney to draft an agreement setting forth terms. He quickly stopped me, laughed and said there was no need. He said, "Look, your cousin knows me. I am originally from Hunan too. [Where I am originally from as well.] You know Hunan peoples' personalities. [Hunan people are noted for generosity.] I am a no trouble guy. I would never seek legal troubles with you if things do not work out. You probably don't know it, but this amount of money is really nothing to me. I do not expect the money back. Treat the money like it is given to you. You can have my word."

10. Weimin even talked about how he once played in the currency market and lost $80,000 and never wanted to touch it again, but had retained a keen interest. When I mentioned that the 20% profit sharing arrangement we had discussed should be written down, because I did not feel comfortable just receiving the money, Weimin told me again there was no need as the money a gift. He said he trusted my cousin and that we are family.

11. I performed some due diligence on my side. I confirmed with my parents that Weimin Hu was a distant relative who had once conducted some business with my uncle in Hunan, China. My cousin also mentioned to me that Weimin had asset of tens of millions.

12. An essential aspect of Weimin's interests in helping us start the automated trading business was that his son would come to the United States to assist us and be trained. In fact, it became apparent to me that creating a real, meaningful learning experience for his son that would enhance his career prospects was what Weimin was most concerned about.

13. Under the arrangement that we agreed upon, my husband and I would provide room and board and training to Weimin's son and share with him our knowledge in the creation and development of, what we anticipated would be, a profitable proprietary trading model. We also agreed that 20% of any profits would go to Weimin Hu. In return, he agreed to provide $300,000 in seed money for initial operating costs to get the company up and running, which, a businessman as sophisticated as Weimin would understand, necessarily would include all basic expenses such as rent, salaries, health insurance, utilities, furniture, computers, attorney fees, etc., as well as any other expenses unique to the business venture we were pursuing.

14. I later learned from Weimin's son that he is a successful businessman and merchant with 30+ years of experience. He was the CEO of a big Chinese government controlled company before starting his own company which conducted business in Iran, Australia, Canada, and other countries. He is also experienced in investing, manages his own investment portfolio and is active in stock trading.

15. It is implausible that an experienced businessman and merchant like Weimin Hu would not ask for even the most basic contractual agreement if the seed money he agreed to provide, and did provide, was intended to be anything other than a gift. If he had ever asked for a written contract, we would have gladly complied. Indeed, I expected to do so and spoke to an attorney to inquire about such matters. It was Weimin Hu who insisted the money was a gift, with no strings or obligations attached, and thus no contract was necessary.

16. On or about December 1, 2011, I consulted with an attorney named David Sussman, from Day Pitney in New Jersey about how to properly set up the company for business. I specifically asked him how to craft the company structure to allow us to pay 20% of any profits to Weimin Hu, preferably without triggering any taxes. (Weimin is aware of America's high taxation and greatly dislikes it). The attorney said it was complicated because first we would need to change the company structure. He then asked me why would I even bother considering this since the money was a gift and the gift giver was not actually insisting upon anything back? I also consulted him for tax consequences and he informed me I did not have to pay taxes for any gifted money.

17. In Chinese culture, cordial business discussions can deteriorate if one side insists on involving a lawyer. We were on a very friendly tone with Weimin at that time and I did not want to offend him by insisting that a lawyer be involved. In fact, I was touched by Weimin's trust in me and I relied on his words. In hindsight, I realize I was foolish in doing so and in also hoping to avoid the attorney fees for drafting the contract and altering company's structure, which the lawyer, Mr. Sussman estimated at $20,000.

18. On December 2, 2011, slightly more than one month away from my due date for our first baby (January 6, 2012), I sent a brief summary email to Weimin that mentioned the various details of our arrangement, including that after consulting an attorney on company structure/tax considerations, I would not have to pay tax on the $300,000 because Weimin's wired money was a gift. Weimin replied "I have read your email carefully. Please arrange everything as you wish."

19. If we had not been assured the seed money for the start-up venture was a gift, we would never have agreed to pursue this venture under such a loosely defined arrangement when we were expecting the birth of our first child in January.

20. I had informed Weimin upfront that the $300,000 would cover one year's expenses only and that if the trading model did not succeed in the first year, it would probably never be profitable and we would not continue. Although I was optimistic, I told him the venture could fail and I never guaranteed there would be any profits.

21. Between December 9, 2011 and February 1, 2012, Weimin wired 6 installments of $49,985 to the business account of Cai Research LLC at the Chase bank branch in Jersey City, NJ. The exact dates were December 9, 2011, January 5, 2012, February 1, 2012 and the wires were sent under four different names (Hu Miao, Li Hongyu, Hu Wei Min, Li Hong Xia), presumably due to China's regulation on currency exchange (a maximum of $50,000 per person, per year). Our bank account was located in Jersey City because that is where we lived and the location from which the Company was to and did operate. Weimin was at all times aware of this.

22. Given our New Jersey location, which Weimin has always known about, it still baffles me why, in May 2013, Weimin sued us (me, my husband, and Cai Research) in New York State Supreme Court, New York County, asserting that the $300,000 gift was actually a "loan" and claiming, among other things, breach of contract. That suit was dismissed in October 2013 for lack of personal jurisdiction in New York.

23. In December 2011, my husband started to give Weimin's son Miao some assignments via email and they also talked by Skype regularly about assignments. With my pending due date of January 9, 2012, however, we were neither eager nor prepared to have Miao

come to the United States right away. We thought the telecommunication arrangement described above would appease Weimin until after my baby arrived, but it did not.

24. I had originally planned for Miao to come to the United States no sooner than late January or early February, as it is common practice for Chinese mothers to rest for a full month after giving birth. Weimin did not like the idea of waiting and he insisted that Miao arrive in the United States as soon as possible. In an effort that I presume was undertaken to ingratiate himself with me, my husband, and my parents, and to further enhance our family-like relationship, in December 2011, Weimin very generously treated my parents to fancy hotels and restaurants when they were in Beijing, on their way to the United States to assist me after I gave birth.

25. On January 7, 2012, one day after my actual delivery, we rented a separate apartment (a one year contract that was partially used as an office and partially used as Miao's residence) in the same building where my husband and I then lived in Jersey City. This was a tremendous burden but we needed to get things ready for Weimin's son Miao as Weimin had purchased an airline ticket for Miao to arrive in JFK Airport on January 11, 2012. Despite the extreme inconvenience, we gladly welcomed Miao and treated him like family, which is accepted and expected in Chinese culture.

26. In accordance with our understanding with Weimin, we purchased furniture and provided room and board for Miao during his nine month stay in the United States. Weimin even once offered us an additional $1500 per month for Miao's room and board, which I declined because I thought he was already generous in giving us $300,000 without demanding anything in return, other than for us to help train and watch over his son.

27. In June 2012, we received an offer from a New York based Fund of Funds to inject an additional five million dollars into our trading capital. After careful contemplation, however, we decided not move forward with it. Weimin was aware of this potential investment and was involved in the discussions and decision making. He told me several times that as a businessman he understood how difficult it was to set up a company and that we should take it slow and feel no pressure from him.

28. Between July and August, we were trying to run a simulation of our trading model on the platform provided by another fund – with that fund's explicit permission to do so. Unfortunately, the simulation did not generate the desired results. On August 15, 2012, we notified Miao that he should start a job search, but that he was welcome to stay with us for as long as he wished. We then assisted Miao in job hunting because we no longer had anything to offer him as far as training or development. Moreover, Miao had been spending inordinate amounts of time watching television, playing computer games and/or surfing the internet, which caused him to often miss essential night trading shifts.

29. After Weimin mentioned that Miao was feeling depressed in July, I started to suspect the real reason for Weimin's urgent need to send his son to the United States – Miao is, according to Weimin, addicted to computer games. Moreover, having Miao at home in China, jobless, is embarrassing to any Chinese parent. On the other hand, working, training or attending University in the United States is still viewed as prestigious in China.

30. Miao's job search was unsuccessful and he left the United States on October 1, 2012. One day later, Weimin asked me "if it was okay" to return to him any leftover amount from the $300,000 gift that was not used to start and run the company. I was very surprised by this request, and I said yes, but only after I first determined whether there was anything leftover

by computing the various costs already incurred and those that were still ongoing. Weimin's tone was still friendly. It seemed like he was merely inquiring about the possibility of getting any leftover money back. I told Weimin I would need some time to calculate the "leftover" money as, at that point, we were being audited by the IRS and I was going through some health problems, so I did not have much time.

31. In an immediate follow-up exchange, Weimin demanded any leftover money back immediately. His friendly attitude and tone had mysteriously vanished. I was still trying to be cordial and told him I needed time to sort it out. Weimin said his agitation resulted from the belief that it would be easy for me to figure out what was leftover since there were so few costs. I told him it was otherwise and at that point, I was convinced I could no longer trust him.

32. Prior to that, I used to get online nearly every day to Skype with Weimin and provide him progress reports concerning his son, for which he consistently expressed his satisfaction and gratitude. I also adjusted our mentorship of Miao according to the feedback I received from Weimin during our conversations. However, with Miao gone, it was no longer necessary for me to have such communications.

33. After we were hit by Hurricane Sandy, we lost stable communication with the outside world for multiple days. When I finally logged back on to my email, I found Weimin's messages had become increasingly hostile. It was then that I stopped all communication with him. I did, however, have email contact with his son Miao in which I indicated that we did not owe Weimin any money.

34. In December 2012, I received a life threatening email from Weimin. In his message, he claimed he would come to the United States at any minute and hunt us down if we dared to enrage him. I was so disturbed by his threat that I reported it to the Jersey City police

immediately and obtained an event number (237768-12). I have since received various insults and threats from him through my relatives and other media.

35. Weimin's Petition references a Cayman Island Fund. There is no such entity and I never informed Weimin that we would establish such an entity in the near future. Any discussions we may have had about such a fund were vague and to the effect that it might be necessary to establish such a fund if we later raised additional capital. The idea behind setting up an off-shore fund is to minimize taxes, which would not become a relevant concern until after we learned whether the trading model we were designing could generate meaningful profits.

36. In December 2012 we closed the major operations of Cai Research LLC and my husband has since gone on to pursue other opportunities.

_____
LIMAN HU

Sworn to before me this
_13_ day of December, 2013.

_____
Notary Public

SUSAN FLETCHER
Notary Public, State of New York
No. 01FL6157560
Qualified in Suffolk County
Commission Expires on 12/11/20_14_